UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FORTUNATO FRONTERA,

                    Plaintiff,

     v.                                                  **DECISION AND ORDER**

UNITED STATES OF AMERICA, et al.,                        05-CV-0423S

                    Defendants.

## I. INTRODUCTION

Plaintiff Fortunato C. Frontera ("Frontera" or "Plaintiff"), commenced this action on June 14, 2005, and filed an Amended Complaint on May 19, 2006. Therein, Frontera alleges that defendants United States of America, thirteen named federal employees, and other unknown federal employees (together, "Defendants" or "the Government") wrongfully deported him and later unlawfully imprisoned and detained him for more than five years when he reentered the United States. According to Plaintiff, he is and was at all relevant times a United States citizen. Frontera asserts claims against the individually named defendants under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq*.

On January 17, 2007, Defendants moved to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and,

alternatively, for summary judgment.[1]  (Docket No. 50).  On April 23, 2007, Plaintiff filed

his opposition to Defendants' motion to dismiss, and cross-moved (Docket No. 56),

pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, for an order denying or

staying Defendants' request for summary judgment on the ground that no discovery has

yet taken place.[2]  Defendants filed a Reply Memorandum of Law ("Defs' Reply") on July

6, 2007, and the matter is now fully briefed.  Having reviewed the parties' submissions, this

Court finds oral argument unnecessary.

## II.  BACKGROUND

This case involves two of the provisions of the Immigration and Nationality Act

("INA") that set forth conditions under which children born abroad may attain U.S.

citizenship.  One pertains to children born to a U.S. citizen and an alien parent, 8 U.S.C.

§ 1401, and the other to children born to two alien parents, at least one of whom later

became a naturalized citizen, 8 U.S.C. § 1432 (repealed Oct. 30, 2000).  The INS

repeatedly found that Frontera had not attained citizenship under the former provision, but

ultimately determined that he had derivative citizenship under the latter.

### A.    Facts

Frontera's father, Tommaso Frontera ("Tom"), was born a United States citizen in

---

[1]  In support of their motion, Defendants filed a Memorandum of Law ("Defs' MOL"), a Statement
of Undisputed Material Facts ("Defs' Rule 56.1 Stmt."), an Appendix to the Local Rule 56.1 Statement of
Material Facts ("Defs' Appx."), with Exhibits A through DD, and a Reply Memorandum of Law ("Defs'
Reply").

[2]  In opposition to Defendants' motion and in support of his cross-motion, Frontera filed the
Affidavit of Craig A. Leslie, Esq. ("Leslie Aff."), with Exhibits A through SS, a Memorandum of Law ("Pl's
MOL"), and a Response to Defendants' Local Rule 56.1 Statement of Material Facts ("Pl's Rule 56.1
Stmt.").

Utica, New York, on February 6, 1915. Tom left the United States for Italy in 1918, when he was approximately three years old, and remained there until 1954. In March 1946, Tom voted in an Italian election, which caused him to lose his United States citizenship under the Nationality Act of 1940. While still in Italy, Tom married Frontera's mother, an Italian citizen. Frontera was born in Italy on May 29, 1950 to two alien parents, his father having lost his U.S. citizenship. Frontera's mother died in 1953, and Tom later married another Italian citizen, Domenica Castano. Domenica never adopted Frontera or his two brothers.

On or about July 24, 1953, Tom filed an application to resume U.S. citizenship and swore an "Oath of Renunciation and Allegiance" at the U.S. Consulate in Naples, Italy. (Am. Compl., Ex. 1-B.) The Naples Consulate issued Tom a U.S. Passport and he returned to the United States in April 1954. (*Id.*, Ex. 1-N.) In December 1954, immigrant visas were issued to Domenica, Frontera, and his two siblings, Vincenzo and Francesco. (*Id.*, Ex. 1-C.) Frontera arrived in the United States on January 13, 1955, and entered the country as a legal permanent resident. (*Id.*)

Some twenty years later, in 1975, Frontera pled guilty to attempted rape in the first degree and was sentenced to four years' incarceration. In 1976, the Immigration and Naturalization Service ("INS")[3] received an alien conviction report on Frontera and commenced an investigation to determine whether he was subject to deportation. (Defs' Appx. Ex. G.) Frontera was interviewed at the Elmira Correctional Facility and stated that his father was a U.S. citizen by birth, and his stepmother became a U.S. citizen through

---

[3] As of March 1, 2003, the Immigration and Naturalization Service was abolished and its functions transferred to the Department of Homeland Security ("DHS"), pursuant to the Homeland Security Act of 2002, 116 Stat. 2135, Pub. L. 107-296, codified at 6 U.S.C. §§ 101 *et seq.* Because the complained of events occurred prior to March 1, 2003, all references herein are to the INS.

naturalization in June 1962. (*Id.*) As part of the investigation, Domenica's "A file"[4] was reviewed. Its contents revealed that Domenica's naturalization was completed on June 7, 1962, she was married to Tom, who was born in Utica, New York, and Frontera's birth mother had died on March 19, 1953. (*Id.*)

Based on the information obtained from Frontera and Domenica's A file, the INS investigator concluded that section 301 of the INA, 8 U.S.C. § 1401 (child born abroad to a U.S. citizen and an alien), applied to Frontera's circumstances, but that Frontera did not acquire U.S. citizenship because his father had not lived in the United States for a total of 10 years prior to Frontera's birth, as was then required. (*Id.* Ex. G.) The investigator also determined that Frontera was not amenable to deportation at that time. (*Id.*)

On February 13, 1989, Frontera filed with the INS an Application for Certificate of Citizenship, Form N-600, in which he claimed derivative citizenship through his father. In the application, Frontera stated that his father was a citizen by birth who had not lost his citizenship, and that his birth mother was deceased. (Am. Compl., Ex. 1-E.) While his application was pending, on June 19, 1989, Frontera was sentenced to a term of 5 to 15 years' incarceration for criminal sale of a controlled substance in the third degree. (*Id.*, Ex. 1-H.) On June 27, 1989, in a letter relative to his N-600 application, the INS advised Frontera that it did not appear he became a United States citizen through his father because his father had not resided in the United States for 10 years prior to Frontera's birth, as was then required by 8 U.S.C. § 1401. (*Id.* Ex. 1-F.) Frontera was invited to submit additional information that might establish that his father did meet the statutory

---

[4] The term "A file" refers to the administrative file maintained by the INS with respect to an alien.

residence requirements, but he did not submit any additional information in that regard. (*Id.*)

An INS agent, Jean M. Peterson, was assigned to investigate the N-600 application and whether Frontera was subject to deportation as a result of his 1989 conviction. (Leslie Aff. ¶ 39.) Among other things, defendant Peterson took a sworn statement from Frontera in which he stated that his father was born in the U.S., and had lived in Italy for an unknown time before returning. (Am. Compl., Ex. 1-H.) Peterson completed an Investigation Workplan, which included the notation "Interview and take SS from subject father, Thomas Frontera, 6 Marilyn Ct., W. Seneca, NY." (*Id.*, Ex. 1-G.) However, instead of interviewing Tom, Peterson took a sworn statement from Frontera's brother, Vincenzo, who responded to questions she posed about their father. (*Id.* and Ex. 1-I.) Vincenzo told Peterson that Tom was born in 1915, left the United States for Italy at age 3 or 4, did not return until 1954, and had not served in the U.S. military. (*Id.*) Vincenzo also gave information about his own circumstances, stating that he was born in Italy and naturalized as a U.S. citizen in 1961. (*Id.*) Peterson concluded that Frontera did not acquire citizenship through his father because Tom had not met the applicable residence requirements prior to Frontera's birth. She determined that Frontera was a deportable alien pursuant to section 241(a)(ii) of the INA. (*Id.*, Ex. 1-J.)

After he was paroled from his state sentence, Frontera appeared in the INS offices in Buffalo, New York, seeking a replacement Alien Registration receipt card. (Leslie Aff., Ex. T.) His A file was reviewed and it was found to contain an unadjudicated N-400 Petition for Naturalization in which Frontera claimed U.S. citizenship from birth through his

U.S. born father.  (*Id.*)  An immigration examiner determined that Frontera did not derive citizenship from Tom, due to Tom's lack of physical presence in the U.S. for the requisite number of years.  (*Id.*)  It was also noted that Frontera had not responded to the INS's earlier request for additional information.  (*Id.*)  Defendant INS investigator M. A. LaMonte was directed to take Frontera into custody, and the INS commenced a deportation proceeding against him as an aggravated felon, pursuant to section 237(a)(2)(B)(I) of the INA.  8 U.S.C. § 1227(a)(2)(A)(iii).  (*Id.*; Defs' Appx. Ex. N.)

Defendant INS agent Thomas A. Matecki completed a "Memorandum of Investigation" in connection with the deportation proceeding and concluded that Frontera did not receive derivative citizenship through his father.  (Am. Compl., Ex. 1-K.)  Agent Matecki found that Frontera did not acquire citizenship under 8 U.S.C. § 1401 because his father did not meet the requirement of physical presence in the U.S. for 10 years prior to his birth, or under § 1432 because his father was a native-born citizen, not a naturalized one.  (*Id.*)  Frontera, who was represented by counsel in the deportation proceeding, ultimately conceded deportability on January 6, 1995, but sought a waiver of deportation. (Defs' Appx., Ex. O.)  The Immigration Judge ("IJ") denied the waiver on the ground that Frontera was statutorily ineligible.  (*Id*. Ex. P.)  Frontera appealed the denial on grounds other than his citizenship, and the Board of Immigrations Appeals ("BIA") upheld the IJ's determination.  (*Id*. Exs. Q, R.)  Frontera was deported to Italy on May 31, 1996.

A year later, on June 10, 1997, Frontera flew to Newark, New Jersey, purportedly to visit his sick father.  He was detained upon reentry and interviewed by defendant INS Inspector William Zanotti, who notified his supervisors of a potential violation of criminal

law in that it appeared Frontera had attempted reentry after deportation and without permission. (*Id.* Exs. S, T.) Frontera gave Zanotti a sworn affidavit in which he stated that he was a citizen of Italy and that his family, except for him, were U.S. citizens. (Am. Compl., Ex. 1-L.) The matter was referred to the United States Attorneys' Office, and Frontera was indicted for illegal reentry of a previously deported alien. (Defs' Appx., Ex. CC.) Frontera later pled guilty to a charge of illegal reentry and, on February 23, 1998, was sentenced to 46 months' incarceration. (*Id.* Ex. V.) His plea necessarily included the admission that he was an alien at the time he reentered the U.S.

In late 1999, while still incarcerated, Frontera wrote to defendant INS employee Nancy Hooks, asking whether he had become a U.S. citizen through either his father, a U.S. citizen by birth, or his stepmother, a naturalized citizen. (*Id.*, Ex. 1-M.) In February 2000, defendant Barch made reference to several pieces of correspondence from Frontera alluding to possible citizenship, and suggested that the matter be referred to the examination branch. (Leslie Aff., Ex. GG.) Defendants Conley and Baskfield reviewed Frontera's file relative to his citizenship in February 2000, and submitted information obtained from the file to defendant Hetzel of the INS's Examination Section for further review. (Leslie Aff., Ex. HH.) Frontera was interviewed on March 2, 2000 with regard to questions raised by the Examination Section, and his brother Vincenzo was interviewed on March 6, 2000. (*Id.*) Based on the file information and further interviews, it was determined that Frontera did not derive citizenship from either his father or stepmother and was amenable to removal. (*Id.*) In March 2000, Frontera received notice that the INS intended to reinstate its prior order of deportation. (*Id.* at II.)

On May 5, 2000, Frontera filed a new Application for Certificate of Citizenship, Form N-600, claiming derivative citizenship through his father. (*Id.* at KK.) Again, he stated that his father was a U.S. citizen by birth who had not lost his citizenship, and that his mother, an Italian citizen, died in Italy in 1953. (*Id.*) An INS officer reviewed Frontera's A file and application, and interviewed Frontera by phone. The officer determined that Frontera's father, Tom, had not met the residency requirements for a U.S.-born citizen that would confer derivative citizenship on Frontera. His application was denied on June 4, 2001. (Leslie Aff., Ex. NN.) Frontera did not appeal the denial.

Frontera's prior deportation order was reinstated on June 4, 2001 (Defs' Appx., Ex. Y), and he was taken into INS custody upon his release from federal prison on June 5, 2001 (Am. Compl. ¶¶ 84-85). On July 2, 2001, Frontera filed a habeas petition in which he claimed, among other things, to have become a citizen on the date his father took his Oath of Allegiance, an act of naturalization. (Am. Compl., Ex. 1-O.) Defendant Holmes was the named respondent. (*Id.*) In or about October 2001, defendant INS Agents Jacobs, Creahan and Edgerton reviewed Frontera's status but found no basis to believe he had obtained derivative citizenship. (Am. Compl., ¶¶ 90-91.)

While the habeas petition remained pending, on April 10, 2002, Frontera filed a third N-600 application in which he asserted derivative citizenship through his father and his stepmother. (Defs' Appx., Ex. AA.) Consistent with his prior applications, Frontera stated that his father was a U.S. citizen by birth who had not lost his citizenship. (*Id.*) This third N-600 application remained pending when the habeas petition was dismissed, on June 4, 2002. (01-CV-00470Sr; copy at Defs' Appx. Ex. F.)

On June 24, 2002, an attorney representing Frontera faxed a letter and documentation to defendant INS District Director, M. Frances Holmes, indicating that Tom, although born in the United States, subsequently lost his citizenship, was an alien at the time of Frontera's birth, and later naturalized. (Am. Compl., Ex. 1-Q.) Counsel noted that "[a] fact in all Mr. Frontera's past assertions was that he was born to one citizen parent (his father) and one alien parent (his mother)." (*Id.*). The attorney provided documentation of Tom's Application to Resume Citizenship and his Oath of Renunciation and Allegiance, which established that when Frontera entered the U.S. in 1955, he automatically derived U.S. citizenship through his then-naturalized father under 8 U.S.C. § 1432. Two days after the letter was faxed, Frontera was released from INS custody. He received a Certificate of Citizenship on June 28, 2002, which states that he became a citizen on January 13, 1955, the date he first arrived in the U.S. (*Id.*, Ex. 1-R.) On October 2, 2002, Frontera's conviction for illegal reentry was vacated and expunged. (*Id.*, Ex. 1-S.)

## B.    The Instant Litigation

On June 17, 2004, Frontera's attorney filed an administrative claim under the FTCA, seeking $7,000,000 for wrongful detention and false imprisonment totaling 1,838 days. (*Id.*, Ex. 1.) The claim was denied on December 16, 2004, *id.*, Ex. 2, and this action followed on June 14, 2005. In his Amended Complaint, filed on May 19, 2006, Frontera alleges three causes of action against thirteen INS employees, and five causes of action against the United States.

The claims against the individual employees are brought pursuant to <u>Bivens v. Six Unnamed Agents of the Federal Bureau of Narcotics</u>, 403 U. S. 388, 91 S. Ct. 1999, 29

L. Ed. 2d 619 (1971), which held that federal employees can be sued for damages consequent to their unconstitutional conduct while acting under color of their authority. Frontera alleges that each of the named individuals violated his constitutional rights when they failed to consider and investigate all bases that could support his claim for citizenship (first and second causes of action), and when they unlawfully imprisoned him in and after 1997 (third cause of action). In his remaining claims, Frontera seeks relief under the FTCA for negligence, gross negligence, and recklessness relative to the investigations of his citizenship (fourth cause of action); wrongful deportation constituting false imprisonment (fifth cause of action); false imprisonment upon his return to the U.S. in 1997 and thereafter (sixth cause of action); malicious prosecution on the charge of unlawful reentry (seventh cause of action); and intentional infliction of emotional distress (eighth cause of action).

According to Frontera, each investigation the INS undertook in connection with deportation proceedings, his Form N-600 applications, and his reentry after deportation was deficient. Specifically, Frontera contends that INS agents failed to take certain mandated steps in investigating his citizenship, including: (1) interview his father; (2) consult all INS databases, including the index of individuals who naturalized after September 27, 1906, to see if his father's name appeared in any INS record; (3) search for and examine his father's INS file; and (4) consider whether Frontera was eligible for citizenship under any provision of the INA, even if the information he provided to the INS did not implicate the provision. (Am. Compl. ¶¶ 42-44, 47, 50, 54, 55, 64, 77, 83, 92-93, 107, 114-116, 128-129, 138, 144; Leslie Aff. ¶ 5.) Frontera claims that each investigation, if properly conducted, would have revealed that his father lost and regained his citizenship, thereby affording Frontera derivative citizenship under § 1432. In short, he claims a

properly conducted investigation would have prevented his deportation and subsequent incarceration for unlawful reentry.

Defendants have moved to dismiss and/or for summary judgment on the grounds that: (1) this Court lacks subject matter jurisdiction over Plaintiff's FTCA claims, which are barred by the discretionary function exception; (2) Plaintiff fails to state a claim under the FTCA; (3) Plaintiff's FTCA claims are untimely, thereby divesting the Court of jurisdiction; (4) Plaintiff fails to state a claim for false imprisonment; (5) Plaintiff fails to state a claim for malicious prosecution; (6) Plaintiff's claims of citizenship were adequately investigated; (7) Plaintiff fails to state a claim under the Fourteenth Amendment; (8) Plaintiff's <u>Bivens</u> claims are untimely; and (9) the thirteen individually named defendants are entitled to qualified immunity.

### III. DISCUSSION

#### A. Subject Matter Jurisdiction

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff bears the burden of establishing the existence of federal jurisdiction. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

Where, as here, the jurisdictional challenges are raised at the pleading stage, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. <u>Sharkey v. Quarantillo</u>, 541 F.3d 75, 83 (2d Cir. 2008). It is "presume[d] that general [fact] allegations embrace those specific facts that are

necessary to support the claim." <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 889, 110 S.

Ct. 3177, 111 L. Ed. 2d 695 (1990) (alterations added).  The court also may consider

affidavits and other evidence outside the pleadings to resolve the jurisdictional issue, but

it may not rely on conclusory or hearsay statements contained in affidavits.  <u>J.S. v. Attica</u>

<u>Cent. Schs.</u>, 386 F.3d 107, 110 (2d Cir. 2004), *cert. denied*, 544 U.S. 968, 125 S. Ct. 1727,

161 L. Ed. 2d 616 (2005).  Indeed, courts "must" consult factual submissions "if resolution

of a proffered factual issue may result in the dismissal of the complaint for want of

jurisdiction."  <u>Robinson v. Gov't of Malaysia</u>, 269 F.3d 133, 140 n.6 (2d Cir. 2001).

"In assessing whether a plaintiff has sufficiently alleged or proffered evidence to

support jurisdiction . . . , a district court must review the allegations in the complaint, the

undisputed facts, if any, placed before it by the parties, and—if the plaintiff comes forward

with sufficient evidence to carry its burden of production on this issue—resolve disputed

issues of fact . . . ."  *Id.* at 140.

Defendants raise two challenges to subject matter jurisdiction: (1) each of Frontera's

FTCA claims is untimely,[5] and (2) the FTCA claims are barred by the discretionary function

exception.

---

[5]  Unlike the FTCA, the question of claims accrual under <u>Bivens</u> is not a jurisdictional issue.
<u>Grancio v. De Vecchio</u>, 572 F. Supp. 2d 299, 302 (E.D.N.Y. 2008).  While disputed facts regarding accrual
of FTCA claims must be resolved by the district court, genuine issues of material fact regarding <u>Bivens</u>
claim accrual are reserved for trial.  *Id.* at 307.  Accordingly, this Court must resolve the question of FTCA
claim accrual, but it may resolve the question of <u>Bivens</u> claim accrual only if the issue can be resolved on
the pleading or, if Defendant's motion is converted to one for summary judgment, no genuine issue as to
any material fact exists.  Though not jurisdictional, this Court will address the timeliness of the <u>Bivens</u>
claims together with the FTCA claims due to the similarity in analysis applicable to both. The Court will
consider the <u>Bivens</u> timeliness issues solely on the pleadings and any documents it might consider on a
motion to dismiss.

### 1.    Timeliness

The Government contends that each of Frontera's FTCA and <u>Bivens</u> claims accrued as early as 1955, when he was first admitted to the United States, and in any event, no later than July 2, 2001, when he filed a habeas petition referencing Tom's oath of allegiance and naturalization.  (Defs' MOL at 22-25, 33-36.)  Thus, the Government urges, each claim is time-barred.

### a.    <u>The Accrual Dates for Plaintiff's Causes of Action</u>

#### i.    *The FTCA*

The FTCA, which waives the United States' sovereign immunity against certain claims sounding in tort, governs Frontera's claims against the government.   Among its prerequisites to suit, the FTCA provides that:

> [A] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b).   Ordinarily, a plaintiff's FTCA claim accrues on the date that the plaintiff discovers he has been injured,  <u>Valdez v. United States</u>, 518 F.3d 173, 177 (2d Cir. 2008) (citing <u>Kronisch v. United States</u>, 150 F.3d 112, 121 (2d Cir. 1998)), and the limitations period is strictly construed, <u>Johnson v. Smithsonian Inst.</u>, 189 F.3d 180, 189 (2d Cir. 1999).

Frontera filed his administrative claim with the Department of Homeland Security ("DHS") on June 17, 2004.[6]  Thus, under a strict application of the limitations period, his

---

[6]  Frontera's civil suit was commenced within six months after his administrative claim was denied.

FTCA claims are timely only to the extent they are based on events occurring on or after June 17, 2002.

>    ***ii.    Bivens***

It is well-settled that "[t]he statute of limitations for <u>Bivens</u> actions arising in New York is three years." <u>Tapia-Ortiz v. Doe</u>, 171 F.3d 150, 151 (2d Cir. 1999) (citing <u>Owens v. Okure</u>, 488 U.S. 235, 251, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989)); *see also*, <u>Harrison v. Lutheran Med. Ctr.</u>, 05-CV-2059, 2007 U.S. Dist. LEXIS 76064, at *10 (E.D.N.Y. Oct 11, 2007).  While state law supplies the statute of limitations for <u>Bivens</u> claims, federal law determines when a federal claim accrues. <u>Kronisch</u>, 150 F.3d at 123.  Under federal law, a <u>Bivens</u> claim accrues at the point in time when the plaintiff knows or has reason to know of the constitutional injury which is the basis of his action. <u>Covington v. City of New York</u>, 171 F.3d 117, 121  (2d Cir. 1999); <u>Adeyi v. United States</u>, 2008 U.S. Dist. LEXIS 86462, at *24 (E.D.N.Y. Mar. 25, 2008).  A plaintiff's complaint must be filed no later than three years thereafter.

Frontera commenced this action on June 14, 2005, so, applying the three-year limitations period, his <u>Bivens</u> claims are timely to the extent they are based on events occurring on or after June 14, 2002.

>    **b.    <u>Application of Limitations Periods to Plaintiff's Claims</u>**

In Frontera's first and second causes of action (<u>Bivens</u>) and his fourth cause of action (FTCA), he alleges that the INS agents assigned to investigate his case at various times did not do all that they were obligated to do in that regard, thereby violating his constitutional rights and breaching their duty to exercise reasonable care with regard to his

claims to citizenship. Accepting the allegations in Frontera's Amended Complaint and the attached supporting documentation, all of the challenged conduct occurred between 1989 (Peterson) and October 30, 2001 (Jacobs, Creahan and Edgerton).

In his fifth cause of action (FTCA), Frontera alleges that he was falsely imprisoned when he was deported on May 31, 1996.

The seventh cause of action (FTCA) alleges that the United States maliciously prosecuted Frontera for unlawful reentry into the United States and when the INS reinstated its prior order of removal. While Frontera does not provide a precise date for the commencement of the criminal proceeding for unlawful reentry, he does allege that his related incarceration commenced in 1997. The INS notified Frontera, in March 2000, of its intent to reinstate its prior order of deportation, and the order was reinstated on June 4, 2001.

In the third (Bivens) and sixth (FTCA) causes of action, Frontera alleges that he was falsely imprisoned beginning in 1997 for unlawful reentry, and when he was detained pending deportation, commencing on June 5, 2001.

The eighth cause of action (FTCA) claims intentional infliction of emotional distress by the individual defendants when they violated his constitutional rights, and falsely arrested and imprisoned him—that is, it is based on all of the conduct alleged in the first through sixth causes of action.

All of the events for which Frontera seeks recovery occurred or commenced prior to June 14, 2002 (Bivens) and June 17, 2002 (FTCA). Thus, under ordinary accrual principles, each claim is untimely unless there is some reason to apply a different accrual date. Frontera's various arguments in this regard are addressed below.

### c.    **The Diligence-Discovery Rule and Equitable Tolling**

#### i.    *The FTCA Claims and the Diligence-Discovery Rule*

As noted above, the FTCA limitations period is strictly construed.  "However, . . . where the government conceals the acts giving rise to plaintiff's claims or where plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual' applies."  Kronish, 150 F.3d at 121.  "Under this rule, 'accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause.'"  *Id.* (quoting Barrett v. United States, 689 F.2d 324, 327 (2d Cir. 1982)).  For example, in a medical malpractice case, the fact of an injury may not manifest itself for some time after the act that caused it, and "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain."  United States v. Kubrick, 444 U.S. 111, 122, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979).  So, in cases of delayed onset injury or a defendant's concealment, application of the diligence-discovery rule may be appropriate.

The Government contends that the diligence-discovery rule does not apply here. Frontera advances two arguments to the contrary.

First, he contends that he could not know the critical facts of his injuries and/or their cause until the "INS acknowledged and **revealed** that it had possessed documents proving that he was a U.S. citizen all along, [which] did not occur until at least . . . June 26, 2002." (Pl's MOL at 42 (emphasis supplied).)  For the following reasons, the Court finds this argument is not consistent with Frontera's allegations and submissions or governing

caselaw.

Discovery of the critical facts does not require that the plaintiff know of each and every relevant fact; the critical facts are known when the plaintiff discovers the injury's existence and the identity of the entity that inflicted it. Barbaro v. United States, No. 05 Civ. 6998, 2006 U.S. Dist. LEXIS 73271, at * (S.D.N.Y. Oct. 10, 2006) (citing Corcoran v. New York Power Auth., 202 F.3d 530, 544 (2d Cir. 1999)).

There can be no question that, as early as February 13, 1989, and on multiple occasions thereafter, Frontera stated his belief that he derived citizenship through his father and sought INS certification of that fact. (Am. Compl., ¶¶ 34, 61, 67, 69, 79, 87 and Exs. 1-E, 1-O; Leslie Aff., Exs. T, KK.) In light of his ongoing claims to U.S. citizenship, Frontera would have been aware that he was injured each time the INS made a determination to the contrary. Likewise, he would have had sufficient information as to the alleged cause of the injury—*i.e.*, the INS's failure to acknowledge his citizenship—when each event on which he bases his claims occurred. As Kronisch instructs, a plaintiff need not have compelling proof of the validity of his claim in order for the claim to accrue, "but must simply have formed a firm belief in his claim based on his awareness of the basic facts of injury and causation." 150 F.3d at 123 n.7; *see also*, Montgomery v. NLR Co., 2007 U.S. Dist. LEXIS 82097, at *3 (D. Vt. Nov. 2, 2007) (accrual turns solely on knowledge of existence and cause of injury, whether or not plaintiff has reason to believe he has actionable claim).

Even were that not the case, to take advantage of the diligence-discovery rule, a plaintiff must be able to show that diligence on his part would not have disclosed the critical facts. Guccione v. United States, 670 F. Supp. 527, 536 (S.D.N.Y. 1987). Yet Frontera's

own submissions confirm that the information he claims is critical here was known to family members and available in documents his father possessed.  (Am. Compl., Ex. 1-Q at 2.) Had Frontera chosen to make his own inquiry about his father's status, this information clearly was accessible to him.

To the extent Frontera uses the term "revealed" to infer government concealment, this Court notes he does not allege the INS was aware of any facts relevant to his or his father's citizenship that it kept from him.  To the contrary, Frontera's Amended Complaint repeatedly alleges that the INS failed to take necessary steps to ascertain those relevant facts, which Frontera ultimately brought to its attention.  In short, his allegations, accepted as true, do not support a finding that the government concealed information from him.

Frontera next argues that though he may have possessed certain facts, he had no way of appreciating their legal significance, and therefore was unable to assert his claims, until he obtained proof from the INS.  However, the Supreme Court has made clear that it is not inclined to treat "a plaintiff's ignorance of his legal rights" in the same forgiving way it has treated a delayed-onset injury or a government cover-up.  <u>Kubrick</u>, 444 U.S. at 122*.* Once armed with the facts that he has been hurt and of who inflicted the injury, the onus is on the plaintiff to seek legal or other applicable advice to determine whether a cause of action exists.  *Id.* at 122-23; *see also*, <u>Kronisch</u>, 150 F.3d at 122 n.6 (plaintiff's belief that he had been harmed by the CIA was sufficient for him to have been aware of need to protect himself by seeking legal counsel).  To excuse him from promptly doing so by postponing the accrual date for his claim undermines the purpose of the limitations statute. <u>Kubrick</u>, 444 U.S. at 123.  Thus, ignorance of the law does not warrant application of the diligence discovery rule.

For all of the foregoing reasons, the Court concludes that the diligence-discovery rule does not extend the limitations period for Frontera's FTCA claims.  *See* Barrett, 689 F.2d at 327-28 (diligence-discovery rule is not often applied outside medical malpractice area, and only where fact of injury is inherently unknowable or government deliberately conceals material facts of its wrongdoing), *cert. denied*, 462 U.S. 1131, 103 S. Ct. 3111, 77 L. Ed. 2d 1366 (1983).

### ii.     *The Bivens Claims and Equitable Tolling*

The three-year limitations period applicable to Bivens claims is subject to equitable tolling only in extraordinary circumstances.  Litle v. Arab Bank, PLC, 2007 U.S. Dist. LEXIS 20539, *12 (E.D.N.Y. Mar. 22, 2007) (citations omitted).  In the Second Circuit, "a statute of limitations may be tolled as necessary to avoid inequitable circumstances . . . . [ ] where a party has been prevented in some extraordinary way from exercising his rights." Allstate Ins. Co. v. Valley Physical Med. & Rehab., P. C., 475 F. Supp. 2d 213, 232 (E.D.N.Y. 2007) (quoting Iavorski v. INS, 232 F.3d 124, 129 (2d Cir. 2000)).  For equitable tolling to apply, the court must determine that the plaintiff: "(1) has acted with reasonable diligence during the time period [he] seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." Zerilli-Edelglass v. New York City Transit Auth., 333 F.3d 74,  80-81 (2003).  Equitable tolling is typically applied when a plaintiff: (1) actively pursues legal remedies but files a defective pleading within the limitations period; (2) was unaware of the existence of a cause of action due to a defendant's misconduct, or (3) suffered from a medical or mental impairment that prevented the timely pursuit of legal claims. *Id.* (collecting cases).

The Government urges that tolling does not apply to the <u>Bivens</u> claims. Frontera's arguments for equitable tolling are the same as those he advances for application of the diligence-discovery rule: (1) he did not have all the critical facts until the INS confirmed that it, too, had documentation that proved his citizenship, and (2) he did not know he had a legal basis to bring a claim until he got that proof.

These assertions do not support the availability of equitable tolling for essentially the same reasons discussed above. Accepting his allegations as true, Frontera knew or should have known of the existence and cause of his injury each time the INS declined to certify his citizenship or took some action predicated on his noncitizenship. He has not alleged that he was prevented in some extraordinary way from timely filing his claim. Moreover, having failed to inquire within his own family about his father's circumstances,[7] he cannot show that he acted with reasonable diligence. Accordingly, the Court rejects Frontera's contention that the equitable tolling doctrine applies to extend the limitations period for his <u>Bivens</u> claims.

### d. **Events Occurring in 1997 and Thereafter**[8]

Frontera next urges that his claims relating to events occurring after his return to the United States in 1997—specifically, his detention upon reentry, conviction for illegal reentry, federal imprisonment, and subsequent INS detention—did not accrue until October

---

[7] The Court finds no merit to Frontera's argument that he cannot be blamed for failing to question his father about the facts of his citizenship status and history because the legal basis for his eventual claim was too "esoteric." Pl's MOL at 41. Frontera has not identified anyone or anything that prevented him from ascertaining the facts.

[8] The Government does not address or respond to any of Frontera's additional arguments for extension or tolling of the statute of limitations. However, once jurisdiction is challenged, the burden is on the Plaintiff to prove its existence, and this Court must examine the viability of Frontera's further arguments irregardless of the Government's failure to do so.

2, 2002, the date his criminal conviction was vacated. Frontera treats these events, and his related claims of false imprisonment and malicious prosecution, as one continuous wrong, with a single accrual date.

### i. *Malicious Prosecution*

Frontera seeks recovery for malicious prosecution only in his seventh cause of action. This claim is brought under the FTCA and Frontera alleges malicious prosecution with regard to both his criminal conviction and the INS's reinstitution of the removal order.

In enacting the FTCA, Congress waived the federal government's sovereign immunity:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). There is no dispute that events relating to the alleged malicious prosecutions occurred in New York State.

The tort of criminal malicious prosecution in New York involves four elements: (1) the defendants' initiation or continuation of a criminal proceeding, (2) termination of the proceeding in the plaintiff's favor, (3) lack of probable cause to commence or continue the proceeding, and (4) actual malice as a motivation for the defendants' actions. Zellner v. Summerlin, 494 F.3d 344, 361 (2d Cir. 2007); Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003).

New York also recognizes the tort of civil malicious prosecution. Washington v. County of Rockland, 373 F.3d 310, 315 (2d Cir. 2004). The same four elements apply to

a civil malicious prosecution claim—the initiation of an action by the defendant against the plaintiff, begun with malice, without probable cause to believe it can succeed, and that ends in the plaintiff's favor—and, in addition, the plaintiff must prove some interference with his person or property. Engel v. CBS, Inc., 145 F.3d 499, 502 (2d Cir. 1998); *see also*, Rolon v. Henneman, 517 F.3d 140, 147 (2d Cir. 2008) (elements of claim for civil malicious prosecution brought pursuant to Section 1983).

Because no cause of action exists for a malicious prosecution claim until the underlying proceeding is terminated in the plaintiff's favor, the claim does not accrue and the statute of limitations does not begin to run until the date on which that termination occurs. Kilgore v. Kaufman, 06:CV-612, 2008 U.S. Dist. LEXIS 74341, at *13-14 (N.D.N.Y. Sept. 25, 2008) (citing, *inter alia*, Murphy v. Lynn, 53 F.3d 547, 548 (2d Cir. 1995)). As the Supreme Court held in Heck v. Humphrey, this "delayed" accrual applies not just to malicious prosecution claims, but to analogous claims that seek monetary damages for confinement that is imposed pursuant to legal process. 512 U.S. 477, 483-84, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994) (there, a Section 1983 claim); *see also*, Davis v. United States, 430 F. Supp. 2d 67, 75 (D. Conn. 2006) (applying delayed accrual to FTCA malicious prosecution claim).

Frontera's claim for malicious prosecution with regard to the criminal charge for unlawful entry did not accrue until the criminal proceeding was terminated in his favor. There is no dispute that this occurred on October 2, 2002, when his conviction was vacated. Similarly, to the extent the seventh cause of action is based on the reinstitution of removal proceedings, the claim did not accrue until those civil proceedings terminated in Frontera's favor. Sims v. United States, 07-CV-02082, 2008 U.S. Dist. LEXIS 88115,

at *10-11 (E.D. Cal. Oct. 29, 2008) (where state law recognized cause of action for civil malicious prosecution, plaintiff's claim, brought in immigration context, did not exist until deportation proceeding was terminated in his favor). Although Frontera urges that this also occurred on October 2, 2002, it is clear that the favorable termination occurred no later than June 28, 2002, when he received his Certificate of Citizenship.

Frontera filed his administrative claim on June 17, 2004, within two years after favorable termination of both the criminal and civil prosecutions. Accordingly, the seventh cause of action is timely.

### ii.    False Imprisonment

Frontera's third (<u>Bivens</u>) and sixth (FTCA) causes of action for false imprisonment are also based on events occurring in and after 1997. Essentially, Frontera alleges that, because he was a United States citizen all along, the INS had no power or authority to refer him for prosecution or to detain him upon his return to the United States.

"'The elements of a false imprisonment [or false arrest] claim are: (1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged. *A favorable termination of the proceedings is not an element of this tort*.'" <u>Curry v. City of Syracuse</u>, 316 F.3d 324, 335 (2d Cir. 2003) (quoting <u>Weyant v. Okst</u>, 101 F.3d 845, 853 (2d Cir. 1996) (emphasis in <u>Weyant</u>).

Frontera urges that the Supreme Court's holding in <u>Heck</u> compels the conclusion that his false imprisonment claims did not accrue until his INS detention ended on June 26, 2002. And even if <u>Heck</u> does not apply, Frontera argues, <u>Wallace v. Kato</u>, 549 U.S. 384, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007), supports application of the June 26, 2002

23

accrual date. This Court disagrees for the reasons stated below.

In Heck, the Supreme Court distinguished between the torts of false imprisonment and malicious prosecution. 512 U.S. at 484. "If there is a false [imprisonment] claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but no more. But a successful malicious prosecution plaintiff may recover, in addition to general damages, compensation for *any* arrest or imprisonment . . . ." *Id.* (internal citations and quotation marks omitted) (emphasis supplied). The holding in Heck was directed to claims arising from confinement imposed pursuant to legal process—that is, after any false imprisonment had ended. *Id.*

Wallace v. Kato squarely addressed this distinction. The question in Wallace was when the statute of limitations begins to run for a claim seeking damages for false arrest. 549 U.S. at 387. After noting that false arrest is a species of false imprisonment, Justice Scalia went on to treat them together as the tort of false imprisonment. *Id.* at 388-89.

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges. Thereafter, unlawful detention forms part of the damages for the "entirely distinct" tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process. If there is a false [imprisonment] claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but no more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself.

*Id.* at 389-90 (internal citations and quotations omitted) (emphasis in original).

Based on the foregoing, the Supreme Court rejected the petitioner's argument that his statute of limitations did not begin to run until his conviction was set aside. Rather, it

concluded, the limitations period for a false imprisonment claim begins to run when the prisoner becomes detained pursuant to legal process—that is, when the false imprisonment ends.[9] *Id*. at 397. So, assuming Frontera was falsely imprisoned, this Court must determine when that imprisonment ended.

Based on Frontera's allegations, his false imprisonment with regard to referral for criminal prosecution would have begun when the INS detained him upon his reentry to the United States on June 10, 1997. Although it is not possible to discern from Frontera's submissions precisely when he became detained pursuant to legal process, it certainly was prior to February 23, 1998, when he was sentenced after having pled guilty to the charge of illegal reentry. Accordingly, to the extent that his false imprisonment claims are based on detention in connection with his criminal conviction, they are untimely.[10]

Frontera was subsequently detained for deportation pursuant to legal process no later than June 5, 2001, when he was taken into INS custody on a reinstated removal order. 8 U.S.C. § 1231(a)(5) (order of removal is reinstated from its original date). However, he alleges that while in INS custody, he provided the INS with sufficient information to alert the agency to his citizenship status, and argues that the INS's failure to act on that information rendered his continuing detention a false imprisonment. Specifically, Frontera points to the statement made in his habeas petition that "I am a

---

[9] Frontera alleges that his unlawful arrest and imprisonment was the proximate cause of the damages he suffered throughout his entire term of imprisonment and INS detention. (Am. Compl. ¶¶ 124, 148). However, the Supreme Court stated in Wallace that damages for detention pursuant to legal process is attributable to an entirely different tort, and even if they could be regarded as consequential damages attributable to the false imprisonment, "that would not alter the commencement date for the statute of limitations." 549 U.S. at 391.

[10] Even had Frontera been falsely imprisoned beyond February 23, 1998, any false imprisonment would have ended no later than June 5, 2001, when he was released from federal prison. This date, even if applicable, would render his claims untimely.

United States citizen as of the date my father took the oath of allegiance upon his return to the United States from Italy." (Am. Compl. ¶¶ 85-93, 122, 146; Pl's MOL at 30-31.) Frontera cites to <u>Hyatt v. United States</u>, for the proposition that a false imprisonment may result from an unlawful detention that arises after an otherwise legal arrest. 968 F. Supp. 96, 110 (E.D.N.Y. 1997). The Government concedes that <u>Hyatt</u> supports Frontera's legal theory (Defs' Reply MOL at 14, n.7). Thus, accepting for purposes of this discussion that a false imprisonment could have arisen upon Frontera's filing of his habeas petition in July 2001, the false imprisonment ended, and the limitations began to run, when Frontera was released from INS custody on June 26, 2002. This date is within the limitations periods as measured from Frontera's administrative filing (FTCA) and the commencement of this civil action (<u>Bivens</u>). Accordingly, the third and sixth causes of action are timely to the extent they are based on the period of INS detention between July 2, 2001 and June 26, 2002.

### e. The Continuing Violation Doctrine

Finally, Frontera urges that he may pursue claims for damages based on all of his interactions with the INS, extending back at least to 1994, because he is entitled to the benefit of the continuing violation doctrine.

The continuing violation doctrine first developed in the context of employment discrimination claims. Under the doctrine, the commencement of a limitations period may be delayed until the final act taken in furtherance of an alleged injury. <u>Butts v. New York City Dep't of Pres. and Dev.</u>, 00-CV-6307, 2007 U.S. Dist. LEXIS 6534, at *22 (S.D.N.Y. Jan. 29, 2007) (citing <u>Washington v. County of Rockland</u>, 373 F.3d 310, 317 (2d Cir. 2004)). However, even in the employment context, the doctrine's application is severely limited. In <u>National R.R. Passenger Corp. v. Morgan</u>, the Supreme Court held that

26

"discrete [ ] acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges*. Each discrete [ ] act starts a new clock for filing charges alleging that act." 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) (emphasis supplied). The Supreme Court left limited room after <u>Morgan</u> for the doctrine's application in connection with hostile work environment claims, the nature of which often involves repeated acts, each of which might not be actionable on its own. *Id*. at 114-15.

Frontera cites two cases in support of his continuing violation argument. Both cases rejected the doctrine's applicability, and neither involved FTCA or <u>Bivens</u> claims.[11] Frontera does not provide any legal analysis to support extension of the doctrine to his particular claims. Instead, he simply posits that he suffered harm from a "chain of continuing acts" perpetrated by defendants. (Pl's MOL at 39-40.) He has not attempted to explain why the acts, each committed at a different time by a different individual, should not be viewed as discrete claims with separate accrual dates.

     i*.*    ***The FTCA Claims***

In <u>Mix v. Delaware & Hudson Ry.</u>, the Second Circuit considered whether the continuing violation doctrine tolls the statute of limitations for claims brought pursuant the Federal Employers' Liability Act ("FELA"). 345 F.3d 82 (2d Cir. 2003), *cert. denied*, 540 U.S. 1183, 124 S. Ct. 1423, 158 L. Ed. 2d 86 (2004). There, the plaintiff alleged a gradual injury which he first became aware of outside the limitations period, but which purportedly evolved to a permanent and distinct injury within the limitations period. *Id.* at 86-88.

---

[11] Moreover, one of the cited cases predates the Supreme Court's narrowing of the doctrine in <u>Morgan</u>, <u>Ward v. Caulk</u>, 650 F.2d 1144 (9th Cir. 1981), and the other, though post-<u>Morgan</u>, bases its discussion on pre-<u>Morgan</u> cases, <u>New York v. Niagara Mohawk Power Corp.</u>, 263 F. Supp. 2d 650 (W.D.N.Y. 2003). Thus, to the extent that Frontera cites these cases in support of broader application of the doctrine, they are not instructive.

The Circuit Court first noted that the Supreme Court has adopted a discovery rule of accrual for both FELA and FTCA claims. *Id.* at 86 (citing Urie v. Thompson, 337 U.S. 163, 170, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949) (FELA) and Kubrick, 444 U.S. at 120-25 (FTCA)). And it went on to repeat the well-established principle that, under the discovery rule, an action accrues when the plaintiff in the exercise of reasonable diligence knows both the existence and the cause of his injury. *Id.* (citation omitted).

In holding that the continuing violation doctrine did not apply to the plaintiff's claims, the Circuit Court reasoned that its application would be inconsistent with the discovery rule; it would allow plaintiffs to recover for injuries whose existence and cause were known to them outside the limitations period. *Id.* at 88. In other words, where the diligence-discovery rule itself did not work to extend the limitations period, the claim cannot become timely through application of the continuing violation doctrine.

In reaching its conclusion, the Court specifically distinguished the "discovery-based" trigger for the statute of limitations in FELA (and FTCA) claims from the "occurrence-based" trigger[12] applicable to employment discrimination claims. *Id.* at 89.

> As the plaintiff's knowledge, in the exercise of due diligence, is dispositive [in a FELA or FTCA claim], it is not relevant whether a single incident of tortious conduct occurs within the filing period . . . [and] the mere fact that the tortious conduct . . . is ongoing does not provide a basis for tolling or restarting the statute of limitations.

*Id*. (alteration added). Thus, to the extent the plaintiff in Mix could prove a distinct injury within the limitations period, the existence and cause of which were not known earlier, the Second Circuit found that he might be entitled to collect damages. But he could not rely

---

[12] Under Title VII, the statute of limitations begins to run when "the alleged unlawful employment practice occurs." Morgan, 536 U.S. at 109 (citing 42 U.S.C. § 2000e-5(e)(1) (emphasis omitted).

on the continuous evolution of his condition to recover for an earlier harm of which he was aware.  *Id.* at 90-91.

For the same reasons the Second Circuit rejected application of the continuing violation doctrine in Mix, this Court does so with regard to Frontera's FTCA claims.  *See* Barbaro v. United States, 521 F. Supp. 2d 276,  (S.D.N.Y. 2007) (rejecting application of continuing violation and continuous treatment doctrines to plaintiff's FTCA claims).  The existence and cause of Frontera's otherwise untimely negligence, false imprisonment (pre-2001), and emotional distress injuries were, or should have been, known to him well before June 17, 2002.  These claims remain time-barred.

### ii.    The Bivens Claims

Likewise, the continuing violation doctrine does not permit Frontera to seek recovery for the otherwise untimely constitutional violations.  The same discovery rule that supplies the statute of limitations for FTCA actions also governs Bivens actions.  Therefore, the foregoing analysis of accrual for Frontera's FTCA claims is equally applicable.  This is particularly so here, where each alleged failure or refusal to acknowledge Frontera's citizenship was in response to some specific application, request, or submission.  The statute of limitation runs independently for each such discrete act.  Barbaro, 521 F. Supp. at 281-282 (declining to apply continuing violation doctrine to Bivens deliberate indifference claim where plaintiff alleged multiple refusals of requests for medical treatment over several years).

To summarize the timeliness issue, the malicious prosecution claim (seventh cause of action) survives, and the false imprisonment claims (third and sixth causes of action) survive to the extent they are based on unlawful detention occurring after July 2, 2001.

### 2.    The FTCA's Discretionary Function Exception

The Government urges that this Court lacks jurisdiction over each of Frontera's FTCA claims because all of them fall within the discretionary function exception to the FTCA's waiver of sovereign immunity.

In enacting the FTCA, Congress chose to waive immunity as to certain claims against the United States.  28 U.S.C. § 1346(b).  The waiver is not absolute.  Rather, the FTCA specifically defines causes of action that may be maintained against the federal government.  In addition, a list of exceptions narrows the availability of claims that may be asserted.  28 U.S.C. § 2680.  The United States' waivers of sovereign immunity are to be strictly construed,  Morales. v. United States, 38 F.3d 659 (2d Cir. 1994) (citations omitted), and "any limitations imposed by the waiver statute, whether they be substantive, procedural, or temporal, are to be strictly applied against the claimant."  Millares Guiraldes de Tineo v. United States, 137 F.3d 715, 719 (2d Cir. 1998).

One of the FTCA's exceptions, codified at 28 U.S.C. § 2680(a), is commonly referred to as the discretionary function exception, and it excepts from the government's waiver:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Its purpose is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." United States v. Gaubert, 499 U.S. 315, 323, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991) (internal citations and quotation marks omitted). In short, Congress acted "to protect the Government from liability that would seriously handicap efficient government operations." United States v. Muniz, 374 U.S. 150, 163, 83 S. Ct. 1850, 10 L. Ed. 2d 805 (1963).

The discretionary function exception contemplates two situations in which the Government is protected from suit. The first phrase of the exception "bars tests by tort action of the legality of statutes or regulations." Dalehite v. United States, 246 U.S. 15, 33, 73 S. Ct. 956, 97 L. Ed. 1427 (1953). The second phrase "excepts acts of discretion in the performance of government functions or duty 'whether or not the discretion involved be abused'"—that is, even where the government actor exercises discretion negligently or improperly. Id.; see also, Callahan v. United States, 329 F. Supp. 2d 404, 407 (S.D.N.Y. 2004) (citation omitted). Protected discretionary acts are not restricted to those made by agency policymakers, for "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." Gaubert, 499 U.S. at 325.

In Berkowitz v. United States, the Supreme Court set forth a two-step test for determining whether challenged conduct falls within the discretionary function exception. First, the reviewing court must determine whether the conduct at issue "involves an

element of judgment or choice."[13]  486 U.S. 531, 536, 108 S. Ct. 1954, 100 L. Ed. 2d 531

(1988).  If the conduct does involve discretionary judgment, the court must then "determine

whether the judgment is of the kind that the discretionary function exception was designed

to shield."  *Id.*  The exception protects only those discretionary actions that are "grounded

in the social, economic, or political goals of the statute and regulations."  Gaubert, 499 U.S.

at 323.

> [F]or a complaint to survive a motion to dismiss, it must allege facts which
> would support a finding that the challenged actions are not the kind of
> conduct that can be said to be grounded in the policy of the regulatory
> regime.  The focus of the inquiry is not on the agents substantive intent in
> exercising the discretion conferred by the statute or regulation, but on the
> nature of the actions taken and on whether they are susceptible to policy
> analysis.

*Id.* at 324-25.

Because the malicious prosecution claim and a portion of the false arrest claim are

the sole FTCA claims not time-barred, they are the only claims that need be examined

here.  Frontera's malicious prosecution claim is based on two discrete events.

First, he alleges that INS agents acted with malice when they referred him for

prosecution upon his reentry to the United States.  (Am. Compl. ¶¶ 152-53.)  Defendant

Zanotti initially detained and interviewed Frontera, and Zanotti, along with INS Agent Linda

Robinson (not a named defendant here), purportedly contacted an Assistant United States

Attorney when it appeared Frontera was attempting reentry after deportation without

---

[13]  The preliminary requirement of judgment or choice is not satisfied if "a federal statute,
regulation or policy specifically prescribes a course of action for an employee to follow" because "the
employee has no rightful option but to adhere to the directive." Berkowitz, 486 U.S. at 536.  Where a
federal employee violates a mandate, there will be no shelter from liability because there is no room for
choice and the conduct will be contrary to the policy on which the mandate rests.  Gaubert, 499 U.S. at
324.

permission.  (*Id.* ¶¶ 63-64; Leslie Aff. BB.)

Next, Frontera alleges that certain defendants acted with malice while he was detained pursuant to the reinstated removal order.  Specifically, he points to the statement in his habeas petition, filed on July 2, 2001, that "I am a United States citizen as of the date my father took the Oath of Allegiance upon his return to the United States from Italy."  (Am. Compl. ¶¶ 87-88, Ex. O.)  In his petition, Frontera identified his father as a United States citizen by birth, who had moved to Italy at age three.  (*Id.*, Ex. O.)  According to Frontera, his statements should have alerted the INS to an issue regarding derivative citizenship. He alleges that defendant INS agents Jacobs, Creahan, and/or Edgerton, and defendant INS District Director Holmes, acted with malice by ignoring this issue in October and November 2001, when they completed a post removal order custody review and determination.  (*Id.* ¶¶ 154-55, Ex. P.)   The alleged failures of Holmes, Jacobs, Creahan and Edgerton are also the basis for what remains of Frontera's false imprisonment claim.

Although the Government purports to challenge jurisdiction with respect to each of Frontera's FTCA claims, it directs its discretionary function exception arguments only to the deportation investigations conducted through 1994, and to investigations made in connection with the processing of Frontera's various N-600 applications.  (Defs' MOL at 14.)  The Government proffers no factual or legal arguments to support applying the discretionary function exception to agents conducting border inspections or to agents conducting post-deportation-proceeding custody reviews.   It cites to no statutes, regulations, or agency guidelines governing agent conduct in these circumstances.   In short, the Government's broad reference to all of the FTCA claims notwithstanding, it has failed to place in dispute this Court's jurisdiction over Frontera's malicious prosecution

claim or the timely portion of his false imprisonment claim.

Because there is no dispute to resolve with regard to these claims, the Government's motion to dismiss on the ground that the underlying conduct falls within the discretionary function exception is denied.

## B.    FAILURE TO STATE A CLAIM FOR RELIEF

The Government argues that, if jurisdiction is found to exist with respect to any of Frontera's FTCA claims, each is subject to dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Here, the Government does advance arguments specific to each of Frontera's claims.

### 1.    Standard of Review

In deciding a Rule 12(b)(6) motion,  the court must accept the factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor.  Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).  A complaint must plead enough facts to be plausible on its face, Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570,  (2007)), and the complaint may be dismissed where it "appears beyond doubt" that the plaintiff can prove no facts that would entitle him to relief. Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991) (citation omitted). Although "the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice."  Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996).

The task of the court addressing a 12(b)(6) motion is not to determine the weight of the evidence, but only to assess the legal feasibility of the complaint.  Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).  "The issue is not whether a plaintiff will ultimately prevail, but

whether the claimant is entitled to offer evidence to support the claims." <u>Scheuer v. Rhodes</u>, 416 U.S. 319, 322, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).

"When determining the sufficiency of [a plaintiff's] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiff['s] . . . complaint, . . ., to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents [offered by the defendant that were] either in plaintiff's possession or of which [the plaintiff] had knowledge and relied on in bringing suit." <u>Brass v. American Firm Technologies, Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993); <i>see also</i>, <u>Cortec Ind., Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 47-48 (2d Cir. 1991), <i>cert. denied</i>, 503 U.S. 960 (1992). If the documents referenced in the complaint contradict the facts and inferences alleged by the plaintiff, the documents control and the court need not accept as true the plaintiff's allegations. <i>See</i> <u>Feick v. Fleener</u>, 653 F.2d 69, 75 n.4 (2d Cir. 1981); <u>United States ex rel. Sommer v. Dixon</u>, 524 F. Supp. 83, 85 (N.D.N.Y. 1981), <i>aff'd per curium</i>, 709 F.2d 173 (2d. Cir. 1983), <i>cert. denied</i>, 464 U.S. 857 (1983).

## 2. The FTCA Claim for Malicious Prosecution

The elements of criminal and civil malicious prosecution claims, and Frontera's allegations in support of his seventh cause of action, are fully set forth above and will not be repeated.

### a. <u>The Referral for Criminal Prosecution</u>

The Government first argues that Frontera can prove no set of facts that would entitle him to relief for malicious prosecution, because Frontera cannot demonstrate that the INS's referral for prosecution after his reentry lacked probable cause. Frontera has not

responded to this argument and apparently concedes that probable cause existed to refer him for possible prosecution upon his reentry.

Even had Frontera not conceded this point, his allegations and the documents properly considered on a motion to dismiss compel the conclusion that probable cause existed.  When Frontera presented for inspection in June 1997, he stated that he was a citizen of Italy[14] who had previously been deported based on his conviction for sale and possession of cocaine.  (Am. Compl. ¶ 60, Ex. L; Leslie Aff., Ex. AA.)  The INS confirmed his identity through fingerprint identification, the fact of his prior deportation as an aggravated felon, and the absence of permission to reenter the United States.  (Leslie Aff., Ex. BB.)  Thereafter, Frontera's indictment created a presumption of probable cause. Bernard v. United States, 25 F.3f 98, 104 (2d Cir. 1994)  (once indictment issues, control of prosecution passes to prosecutor and is no longer within agent's authority); Weintraub v. Board of Educ. of N.Y., 423 F. Supp. 2d 38, 59 (E.D.N.Y. 2006) (claim for malicious prosecution arises only after an arraignment or indictment or some other evaluation by a neutral body that charges were warranted).

Frontera concedes that he provided no evidence upon reentry or *throughout his prosecution* that would prove, or even suggest, that he was a United States citizen.  (Am. Compl. ¶ 66.)  *See*, Rothstein v. Carriere, 373 F.3d 275, 292 (2d Cir. 2004) (to recover for malicious prosecution, plaintiff must establish that, *at the time prosecution was initiated*, there was no probable cause).  In fact, Frontera pled guilty to the charge of unlawful reentry.  (*Id.*)

---

[14]  Frontera's allegation that he asserted U.S. citizenship at the border (Am. Compl. ¶ 61) is unavailing in light of his sworn statements to the contrary.

Lack of probable cause is an essential element of malicious prosecution, and its existence is a complete defense to a malicious prosecution claim. Aretakis v. Durivage, 07-CV-1273, 2009 U.S. Dist. LEXIS 7781, at *46 (N.D.N.Y. Feb. 3, 2009) (citations omitted). Based on Frontera's Amended Complaint and the documents he attached and/or relied on, it is clear he cannot prove probable cause was lacking at any point from his indictment until his prosecution concluded. Accordingly, the Government's motion to dismiss is granted insofar as Frontera's malicious prosecution claim is based on the conduct of INS border agents who interviewed him upon his reentry in 1997.

### b. The Post-Order Custody Review and Determination

Next, the Government urges that post-order custody review by agents Jacobs, Creahan, and/or Edgerton, and defendant Holmes' determination to continue custody, cannot support a claim for malicious prosecution because all of the allegations relate to events occurring in October 2001 and thereafter, long after criminal proceedings had concluded. The Government has declined to recognize the existence of a claim under New York law for civil malicious prosecution. Rather, it urges that "plaintiff cannot demonstrate he was subject to a *criminal* prosecution when his deportation order was reinstated and/or when administrative custody determinations were made." (Defs' MOL at 29 (emphasis added).)

Frontera first argues, and this Court already has found (Point III(B)(3)(a), *supra*), that New York law recognizes the tort of civil malicious prosecution. Thus, to the extent the Government rests its argument on the fact that deportation proceedings are civil in nature, dismissal is inappropriate.

Frontera goes on to urge that a claim for malicious prosecution may arise if a "civil proceeding is continued after an investigating agent, who is involved both in the investigation and the conduct of the proceeding, discovers facts that demonstrate the proceeding should be terminated." (Pl's MOL at 32). In short, Frontera suggests that even if probable cause existed to commence a deportation proceeding against him, the actions of defendants conducting a post order custody review can give rise to a malicious prosecution claim. It is here that this Court must disagree.

Frontera's argument neatly dodges the Government's central point—that conduct occurring *after prosecution has ended* cannot give rise to a malicious prosecution claim. To the extent Frontera seeks to challenge this premise, his reliance on Ware v. United States, 838 F. Supp. 1561 (M.D. Fla. 1993), is misplaced. In Ware, there was probable cause for the plaintiff's arrest and he was later indicted. However, an FBI agent subsequently withheld exculpatory evidence from the plaintiff which would have undermined the government's theories at trial. The district court found that the plaintiff could maintain an action for malicious continuation of prosecution after the exculpatory facts were discovered.

The exculpatory evidence in Ware was discovered *before the criminal prosecution concluded*. *See also*, Hyatt v. United States, 968 F. Supp. 96, 111 (E.D.N.Y. 1997) (although there was reasonable basis to arrest plaintiff, government lacked probable cause to continue prosecuting him after significant facts arose pointing to a misidentification.) Here, in contrast, Frontera cannot point to any proceeding that was ongoing when his post-order custody review was conducted in October and November 2001. Frontera's civil deportation "prosecution" ended no later than February 28, 1996, when he exhausted his

38

appeals after having conceded deportability. (Defs' Appx. Ex. Q.)  And the reinstatement of a removal order is just that—a reinstatement; the subject of the order has no right to a hearing.  8 C.F.R. § 241.8.

Frontera has not alleged, and cannot prove, that defendants Jacobs, Creahan, Edgerton, or Holmes were involved in the initiation or continuation of any proceeding against him.  He has offered no caselaw that supports basing a malicious prosecution claim on conduct that occurs after the prosecution has ended, and this Court is aware of none.  While post-proceeding conduct may be actionable under some theory of recovery, it does not give rise to damages based on malicious prosecution.  Accordingly, the Government's motion is granted on this basis, and the seventh cause of action is dismissed in its entirety.

### 3.      The FTCA and <u>Bivens</u> Claims for False Imprisonment

As has already been determined, Frontera's claims of false imprisonment are timely only to the extent they are based on his civil confinement pending deportation pursuant to the reinstated removal order.  In that regard, Plaintiff alleges that even if his initial detention upon reentry in 1997 was lawful, he was falsely imprisoned from the time INS agents were alerted, or should have been alerted, to his citizenship status.

The Government concedes that <u>Hyatt v. United States</u>, cited by Frontera, supports the proposition that a false imprisonment can arise even if the initial confinement is supported by probable cause.  968 F. Supp. at 108-110.  However, it urges that the circumstances here are factually distinguishable and that the INS did not receive any information prior to June 24, 2002 that did call, or should have called, the removal order and Frontera's custody into question.

In <u>Hyatt</u>, the plaintiff was arrested in 1990 on a warrant issued in 1983, after his INS file was mistakenly incorporated into a DEA investigation file. Despite that mistake, the district court found the 1983 request for a warrant was reasonable. However, the court did take issue with repeated mistakes and omissions made thereafter that resulted in the plaintiff's confinement. *Id.* According to the court, it should have been apparent to the government that the plaintiff was not the actual suspect in the DEA investigation. Among other things, the plaintiff lived in Belize, while the suspect was known to reside in Jamaica; the suspect was missing his left eye and the plaintiff was not; the government relied for identification on an agent who had met with the suspect for one hour, nine years earlier, but did not call informants who had recent, personal knowledge of the suspect; and the suspect was medium complected, while the plaintiff had a dark complexion. The district court found that the government's cumulative mistakes and omissions in the face of all of these documented discrepancies dissipated the reasonableness of the plaintiff's confinement and, in fact, amounted to gross negligence. *Id.* at 109. The government was found liable for false imprisonment during the period in which it acted without reasonable grounds to believe that the plaintiff had committed an offense. *Id.* at 110; *see also*, <u>Ware</u>, 838 F. Supp. at 1564 (where a police officer or agent discovers and then purposely withholds exculpatory evidence, it may amount to false imprisonment); *see generally*, <u>Jones v. City of Chicago</u>, 856 F.2d 985, 998, 993-94 (7th Cir. 1988) (false imprisonment may arise where reasonable officer would have known that probable cause does not exist, and jury did not err in finding police and city liable for making false reports and "deep-sixing" exculpatory evidence in circumstances the court described as a "frightening abuse

of power").

The Government contends that the instant case is factually distinguished from <u>Hyatt</u> and others of its ilk, and this Court agrees for the reasons stated below.  It is important to note that Frontera does not challenge the conclusion repeatedly  reached by the INS that, <u>assuming</u> his father was a U.S. citizen by birth who had not lost his citizenship, he was not entitled to derivative citizenship.  Rather, Frontera challenges the INS's failure to find that the facts were otherwise.

As fully set forth in the statement of facts (Point II(A), *supra*), Frontera entered the U.S. as a legal permanent resident; when interviewed by the INS in 1976, he stated that his father was a U.S. citizen by birth; he filed a Form N-600 in 1989 stating that his father was a citizen by birth who had not lost his citizenship; his statements in a 1989 interview were consistent with the N-600; he filed a petition for naturalization claiming citizenship through his U.S. born father; he conceded deportability in 1995, thereby acknowledging his alien status; when interviewed upon reentry he stated that his father was born in the U.S.; he pled guilty to unlawful reentry in 1997 or 1998, thereby conceding his alien status; he wrote to the INS in 1999 stating that his father was a U.S. citizen by birth; he filed a Form N-600 in 2000 stating his father was a citizen by birth who had not lost his citizenship; and he filed a Form N-600 in 2002 stating his father was a citizen by birth who had not lost his citizenship.

Between these final two Form N-600 filings, Frontera filed a habeas petition in which he identified his father as a U.S. born citizen who moved to Italy at age three.  (Am. Compl. Ex. O.)  Frontera went on to claim that he derived citizenship "as of the date my father took the oath of allegiance upon his return to the United States."  *Id.*  He did not provide any

evidence in support of this statement, nor did he expressly state that his father had lost his U.S. citizenship and later repatriated or naturalized.

As a matter of law, on the basis of this single, ambiguous and unsupported statement, no reasonable agent would or should have known that some set of facts existed other than those Frontera had consistently and repeatedly presented to the INS. In short, no agent reasonably should have been alerted, on the basis of this and the entire cumulation of Frontera's statements, to his citizenship status. Hyatt, 968 F. Supp. at 109-110 (basing assessment of reasonableness on totality of circumstances). The circumstances here are readily distinguished from the repeated, knowing and egregious conduct set forth in the cases on which Frontera relies.

Moreover, the plaintiffs in Hyatt, Ware, and Jones were at the mercy of officials who were privy to information that was unavailable to the plaintiffs. Here, Frontera seeks to hold Defendants accountable for acting in accordance with the statements and facts he provided. The exculpatory information that ultimately came to light was possessed by Frontera's family. Once Frontera provided it to the INS, the agency acted swiftly and without delay. Prior to that time, the INS had reasonable grounds to believe that Frontera was properly confined.

On the facts alleged and the supporting documentation, Frontera cannot establish that his confinement was not otherwise privileged. Accordingly, Defendants' motion to dismiss his third and sixth causes of action for false imprisonment is granted.

## C.    PLAINTIFF'S RULE 56(f) MOTION

Because Frontera's action is subject to dismissal in its entirety under Rules 12(b)(1) and 12(b)(6), there is no need to consider the Government's alternative request to convert

its motion to one for summary judgment.  Accordingly, Frontera's cross-motion, brought pursuant to Rule 56(f), in opposition to such conversion is moot.

## IV.  CONCLUSION

For the reasons stated, Defendants' Motion to Dismiss the Amended Complaint is granted in its entirety.  Plaintiff Frontera's Cross-Motion pursuant to Rule 56(f) is denied as moot.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion to Dismiss (Docket No. 50) is GRANTED and the Amended Complaint is dismissed in its entirety.

FURTHER, that Plaintiff's Cross-Motion pursuant to Rule 56(f) (Docket No. 56) is DENIED as moot.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.


SO ORDERED.

Dated:          March 31, 2009
                Buffalo, New York


                                        /s/William M. Skretny
                                         WILLIAM M. SKRETNY
                                        United States District Judge